IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. _____

CHRISTOPHER P. GATES,

      Plaintiff;

v.

UNITED AIRLINES, INC.,

      Defendant.

---

## COMPLAINT
### Jury Trial Demanded

*The greatest evil is not done in those sordid dens of evil that Dickens loved to paint ... but is conceived and ordered (moved, seconded, carried, and minuted) in clear, carpeted, warmed, well-lighted offices, by quiet men with white collars and cut fingernails and smooth-shaven cheeks who do not need to raise their voices.*

C.S. LEWIS

\* \* \*

## INTRODUCTION

1.      For over twenty-five years, Plaintiff Christopher Gates navigated the skies for Defendant United Airlines. As a First Officer, Gates had flown through thunderheads across open oceans, guided aircraft through treacherous windshear, and safely landed families in zero visibility. Before flying for United, he served his country as a Navy aviator, earned military Instructor of the Year honors, and continued his service in the Naval Reserve. His record was unblemished. But then, in 2021, United grounded him—and ultimately fired him—simply because he could not, in good conscience, inject himself with an experimental drug that was developed and tested through the destruction of unborn humans.

2.      In August 2021, United instituted a COVID-19 vaccination requirement for most (but not all) employees. Gates's bona fide religious beliefs forbade him from complying with United's mandate. So Gates requested a religious accommodation, which United was legally required to consider.

3.      But United refused to consider his request. The airline's stated reason? That Gates had submitted his request six days after an arbitrary administrative deadline. No one at United asked him about his religious beliefs. No one explored whether an accommodation was possible. And no one weighed his decades of service against six days. Instead, United took away his wings and fired him. A decorated

1

veteran pilot lost his career because somewhere, in a well-lit office, someone checked a box and moved on to the next file.

4.    As one federal court observed, United's vaccination mandate "reflects an apathy, if not antipathy, for many of its employees' concerns and a dearth of toleration for those expressing diversity of thought." *Sambrano v. United Airlines, Inc.*, 570 F. Supp. 3d 409, 420 (N.D. Tex. 2021), *rev'd and remanded*, No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022).

5.    United's arbitrary deadline further reflected that antipathy. Indeed, the deadline functioned as a filter, screening out employees confused or offended by United's humiliating hurdles to obtain a religious accommodation. For some, like Gates, the deadline was fixed. But for others, like those who were on leave when the mandate was issued, it was fluid. And a federal court later temporarily enjoined United "from denying any requests for religious or medical accommodations from United Airlines, Inc.'s COVID-19 vaccine mandate due to timeliness (i.e., because the requests were submitted after the August 31, 2021 deadline)." *Sambrano v. United Airlines, Inc.*, 2021 WL 4760645, at \*1 (N.D. Tex. Oct. 12, 2021). Despite that injunction, United did not reconsider Gates's request after it removed him from the flight schedule. Instead, United fired him.

6.    Ultimately, the deadline's validity is beside the point. Title VII imposes on employers an *affirmative* duty to engage in good faith with employees who request a religious accommodation. That duty arises when the employer receives notice of a conflict between an employee's religious practice and a workplace requirement. An

employer cannot extinguish that statutory obligation by imposing an arbitrary administrative cutoff. Once United received Gates's request, it was required to engage with him, explore whether accommodation was possible, and determine whether an accommodation would impose an undue hardship. United did none of these things. It left him on the tarmac, simply because one of his religious beliefs "offends the sensibilities of the executives who populate the C-suite." *Sambrano v. United Airlines, Inc.*, 45 F.4th 877, 878 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc).

7.    Gates therefore brings this action to vindicate his right to practice his faith without forfeiting his livelihood, and to hold United accountable for recklessly and maliciously coercing him "into a choice between [his] religious convictions and continued employment." *Sambrano v. United Airlines, Inc.,* No. 21-11159, 2022 WL 486610, at *6 (5th Cir. Feb. 17, 2022).

## JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3). The Court has supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367.

9.    This Court has specific personal jurisdiction over Defendant because it purposefully availed itself of the privilege of conducting business in Colorado. United directs one of its major domestic hubs at Denver International Airport; operates United's Denver-based Flight Training Center (FTC), the world's largest pilot training center where over 20 other airlines and government agencies send their

3

personnel to train; employs thousands of workers in Colorado; flies hundreds of daily flights through Colorado airspace; and implements employment policies that govern its Colorado workforce. When United announced its vaccination mandate and accommodation process, it necessarily directed that policy toward every state where its employees lived and worked, including Colorado. United's primary Colorado hub operations are located at 8500 Peña Boulevard in Denver. United also operates the FTC at 7500 East 35th Avenue in Denver, where the airline carries out human-resource functions, including disciplinary and termination proceedings. United maintains additional operational facilities at 27150 East 75th Avenue in Denver. And the airline is currently constructing a new 114-acre campus near Tower Road and 64th Avenue, next to Denver International Airport, which is expected to house approximately 5,000 employees upon completion.

10.    Venue is proper under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because United's unlawful employment practices occurred in this District. At all relevant times, Gates was based at United's FTC in Denver. The decision to deny Gates's accommodation was implemented in Colorado, Gates was removed from the schedule in Colorado, and he was terminated through proceedings conducted at United's FTC at 7500 East 35th Avenue in Denver.

11.    On November 8, 2021, Gates filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC), which issued a Notice of Right to Sue on September 17, 2025. The EEOC found reasonable cause to believe violations of Title VII occurred. Gates filed this action within ninety days of that

4

notice. Gates thus has complied with all prerequisites to jurisdiction in this Court under Title VII.

**PARTIES**

12.    Plaintiff Christopher Gates is a citizen of the United States and resides in Bennett, Colorado. Gates worked for Defendant United Airlines, Inc., as a pilot from 1996 to December 2021, most recently as First Officer. Gates is an "employee" as defined by Title VII, 42 U.S.C. § 2000e(f), and Colo. Rev. Stat. Ann. § 24-34-401(2).

13.    Defendant United Airlines, Inc., is a Delaware corporation with its principal place of business in Chicago, Illinois. United employs more than 500 employees, and it is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), and Colo. Rev. Stat. Ann. § 24-34-401(3).

**FACTUAL ALLEGATIONS**

**An Unblemished Career of Service**

14.    Gates's flying career began in service to his country. As a United States Navy aviator specializing in aircraft carrier operations, Gates logged thousands of hours in some of the most demanding flight conditions imaginable. He rose through the ranks, held multiple leadership positions, and was recognized as military Instructor of the Year. Even after joining United in 1996, he continued serving in the Naval Reserve.

15.    At United, Gates proved equally dedicated. He served as a Pilot Instructor at United's FTC, the largest flight training facility in the world, where he operated full flight simulators and was entrusted with training and evaluating

5

hundreds of pilots and flight crews to ensure they met Federal Aviation Administration standards for operating multimillion-dollar aircraft. He was selected to serve on the integration team during the United-Continental merger. And he earned a master's degree in finance while maintaining his flight schedule.

16.    In all his years, Gates never failed a check ride. He was never pulled from a trip for personal or professional concerns. And he had never faced disciplinary action of any kind.

17.    By every measure United could apply, Gates was an exemplary pilot.

### A Faith Rooted in the Dignity of the Human Person

18.    Gates is a practicing Catholic. Central to his faith is the belief that every human life possesses inherent dignity from the moment of conception. Gates thus believes that the deliberate destruction of unborn human life, such as through abortion, is a grave evil. He believes that experimenting on cell lines harvested from the remains of aborted children is morally abhorrent, a compounding of one grave evil upon another. And he believes that injecting himself with a drug developed or tested through such experimentation would make him complicit in that evil, however remote his participation might appear to others. His conscience simply will not permit it.

19.    The COVID-19 vaccines available to Gates in 2021 each had a connection to abortion. The Pfizer and Moderna vaccines were tested using HEK 293, a cell line derived from kidney tissue obtained from an elective abortion performed in the Netherlands in 1973. Researchers used HEK 293 cells during development to

6

confirm that the vaccines would prompt human cells to produce the intended viral protein. The Johnson & Johnson vaccine had a more direct connection: it was both developed and manufactured using PER.C6, a cell line derived from retinal tissue obtained from an elective abortion performed in 1985.

20. To Gates, the vaccines' connection to abortion was real and traceable. Thus, accepting and injecting a vaccine produced through the destruction of an unborn child would make him a participant in an act his faith teaches is intrinsically evil.

21. To be sure, Gates was not a provocateur or a contrarian. Following the onset of the COVID-19 public-health emergency, and before the mandate, United considered Gates an essential employee. He followed the airline's health and safety protocols without objection, including submitting to temperature checks before entering United facilities and wearing a mask as required. He continued to fly, continued to train other pilots, continued to perform at the same level he always had.

22. But once United announced its vaccination requirement, Gates became expendable overnight. His work had not changed. His reliability had not changed. His record remained unblemished. The only thing that changed was that Gates, because of his religious beliefs, could not comply with United's new demand. For that, United discarded a quarter century of service.

### United's COVID Vaccination Mandate

23. On August 6, 2021, United announced that all U.S.-based employees who enter United facilities must receive a COVID-19 vaccine by September 27, 2021.

24.     Employees who failed to receive a COVID-19 vaccine by September 27 or obtain an approved exemption would be terminated.

25.     United justified its vaccination mandate as necessary to protect the health of employees, passengers, and the public. But United's mandate was riddled with exceptions. The airline did not require passengers to be vaccinated, even though they spent hours in an enclosed cabin with United crew. It did not require vaccination for employees based in other countries, even though those employees worked alongside U.S.-based crews. It did not require vaccination for pilots from other airlines who occupied the cockpit jumpseat on United flights. It did not extend its mandate to United Express, whose pilots flew United passengers on United routes under the United brand. It did not require vaccination for third-party caterers who prepared food served on United flights, or for contractors who worked in United facilities. And it exempted employees in states that prohibited proof-of-vaccination requirements.

26.     In short, unvaccinated individuals were everywhere in United's operation. The airline targeted its own employees while leaving untouched the passengers, partners, and vendors who moved freely through the same aircraft and the same terminals.

**United's Purported Exemptions to the Mandate**

27.     United's mandate provided two purported exemptions: one for employees who cannot get vaccinated due to medical reasons, and the second for

employees who object to being vaccinated on the basis of sincerely held religious beliefs and practices.

28.　The written mandate did not provide a deadline to submit a request for an accommodation, but United later set the deadline for August 31, 2021. United did not explain why religious accommodation requests required an earlier deadline than vaccination itself. The airline would not even verify vaccination compliance until months after the accommodation deadline.

29.　Despite offering exemptions, United "instituted a regime in which nothing short of complete compliance with its commands will suffice." *Sambrano*, 570 F. Supp. 3d at 420. Indeed, United's religious-exemption policy was merely window dressing to insulate itself from Title VII litigation.

30.　In both purpose and effect, United sought to grant as few religious accommodations as possible. Indeed, "United's CEO, Scott Kirby, expressed skepticism and apparent disdain for any religiously-motivated exemption requests." *Sambrano*, 570 F. Supp. 3d at 420. At a United "town hall meeting," Kirby declared that "very few" religious exemptions would be granted and then warned "any employee [who] all the sudden decided I'm really religious" would unequivocally be "putting your job on the line. You'd better be very careful about that." *See id.* (citation omitted). As one court observed, "[s]uch statements paint a vivid picture of United's perspective on employees who requested religious exemptions." *Id.*

**The Exemption Deadline That Wasn't**

31.    United claimed the August 31 exemption deadline would "allow sufficient time for processing ahead of the requirement due date." Yet United enforced it at whim.

32.    For example, United expressly gave additional time to employees who were on leave at the time it instituted the mandate to submit an exemption request. Such employees were permitted to "begin [their] RAP request a month ahead of [their] anticipated return date." So, for instance, a United employee who was on leave until December 2021 could submit an exemption request in November 2021 and thus not be subject to the August 31 submission deadline.

33.    The deadline was temporarily enjoined by a federal district court. On October 12, 2021, the court in *Sambrano v. United Airlines, Inc.*, issued a temporary restraining order enjoining United from "denying any requests for religious or medical accommodations from United Airlines, Inc.'s COVID-19 vaccine mandate due to timeliness (i.e., because the requests were submitted after the August 31, 2021 deadline). 2021 WL 4760645, at *1. That order was based on United's *stipulation* with the plaintiffs not to enforce the vaccination mandate while the court considered the plaintiffs' motion for preliminary injunction. Thus, while United represented to the federal court that it would not enforce the August 31 deadline, it continued to do so— including against Gates.

34.    Numerous other examples show that United played fast and loose with its deadlines. In light of logistical challenges encountered by certain employees,

10

United gave certain employees who received their first dose by September 27 until the end of October to get their second dose without threat of termination. United gave no such extension for employees who did not submit an exemption request by August 31. United also gave employees who engaged in the exemption process and subsequently withdrew their request, had their request canceled, or had their request denied additional time to receive their vaccinations before United began any separation process.

**United's Religious Inquisition**

35.    United's written policy stated that it "is intended to comply with all applicable laws" and recognized religious belief as a potential basis for accommodation. It promised that "[w]hen United receives notice from the employee or their representative of the need for an accommodation, United will engage in an interactive process to identify possible accommodations."

36.    Despite feigning compliance with "all applicable laws," United's policy was designed to browbeat hesitant employees into vaccination.

37.    Once an employee requested a religious exemption, United would ask him about his past vaccinations and medication, whether the drugmakers used stem cells in those vaccines, why receiving those vaccines or medications did not violate the employee's religious beliefs, and why his religious beliefs prevented him from receiving the COVID-19 vaccine but not from taking other types of medicine.

38.    United also required employees seeking a religious accommodation to submit either a "pastor's note" attesting to the validity of the employee's religious

11

beliefs or "written documentation" from a third party who personally knows the employee to "support" the request.

## First Officer Gates: Grounded—then Terminated

39. When Gates received United's vaccination mandate in August 2021, he immediately understood that it placed his faith in conflict with his career. So he began to prepare a religious-accommodation request.

40. But as he did so, Gates learned more about what United's "accommodation process" actually entailed. The airline was not simply accepting his representations about his religious beliefs. Instead, as noted above, it would require a third-party attestation as to the sincerity of those beliefs. It would also interrogate him about his past vaccinations, demanding to know why receiving those vaccines had not violated his religious beliefs.

41. Gates found this process deeply offensive. His faith was not something that could be reduced to a corporate form to be scrutinized by a pencil-pusher in a nondescript office tower. His faith was central to his very self, sustaining him through decades of service to his country and his career as a pilot. The notion that an HR representative at an airline company would sit in judgment of his religious sincerity while parsing his medical history struck him as insulting—and legally suspect.

42. Given the recklessly short window between the mandate's announcement and the exemption deadline, Gates had only weeks to wrestle with whether he should submit himself to a process that seemed designed to humiliate him rather than accommodate his religious beliefs. Gates was unable and unwilling

12

to subject his faith to the approval of third parties, as United was requiring. As he struggled with what to do, particularly in the face of United's unlawful requirement that Gates submit third-party verification of his religious beliefs, the August 31 deadline passed.

43.    But the weight of his situation was inescapable: he was being forced to choose between his conscience and his career. Moreover, Gates heard that United was possibly relaxing or removing its insistence that religious beliefs be verified by third parties. So on September 6, 2021, he submitted a request for a religious accommodation—six days after United's elastic deadline but still twenty-one days before he was required to be vaccinated and more than two months before United would even check for compliance.

44.    United refused to consider Gates's request for a religious accommodation. The airline did not ask Gates to explain his religious beliefs. Nor did it discuss possible accommodations. And it did not analyze whether any accommodation would impose an undue hardship on the company. United simply failed to engage in any interactive process as Title VII requires.

45.    In the *Sambrano* litigation, United's Vice President of Human Resource Services submitted a declaration describing the company's accommodation process. He stated, under oath, that United "engaged in an interactive dialogue with all employees requesting accommodations" and "rendered a decision to the employee based on the circumstances of each case." But Gates received no interactive dialogue.

13

United rendered no decision based on the circumstances of his case. It refused to consider his circumstances at all.

46.    United's sole stated reason was that the request had been submitted after August 31, 2021—even though the airline repeatedly fudged that deadline and even stipulated to a court injunction temporarily restraining its enforcement.

47.    On September 28, 2021, United removed Gates from the flight schedule. After twenty-five years in the cockpit, he was grounded for seeking to live and work according to his sincerely held religious beliefs.

48.    On December 6, 2021, United terminated Gates's employment. The termination letter made no mention of his religious accommodation request. It stated only that Gates had been charged with "failing to obtain the COVID 19 Vaccination and upload proof."

49.    Gates appealed. A hearing was held on February 14, 2022, pursuant to the United Pilots' Agreement. His union representative argued that United's deadline was arbitrarily imposed, that the policy had been unevenly applied, and that Gates should receive the same leave accommodation provided to employees who submitted timely requests.

50.    On February 17, 2022, three days after the hearing and while the decision was pending, the Fifth Circuit issued its decision in *Sambrano v. United Airlines, Inc.*, which found that "United is actively coercing employees to abandon their convictions." No. 21-11159, 2022 WL 486610, at *9 (5th Cir. Feb. 17, 2022).

14

51.    Despite a federal court of appeals' admonition that United's mandate has presented  "an impossible choice for [employees] who want to remain faithful but must put food on the table," *Sambrano*, 2022 WL 486610, at *9, the airline did not reconsider Gates's termination.

52.    Instead, on February 25, 2022, eight days after the Fifth Circuit's ruling, United's Senior Vice President of Flight Operations issued his decision on Gates's appeal. The decision made no mention of the Fifth Circuit's opinion but simply rested on a single ground: "Based on your untimely submission, the Company appropriately denied your request for a religious accommodation. Therefore, you maintain no protected rationale to support your failure to receive the COVID-19 vaccination." Thus, just eight days after a federal appellate court had laid bare the arbitrary nature of its exemption process, United still doubled down on its discriminatory policy.

53.    Gates had given United twenty-five years. He had carried tens of thousands of passengers safely through the skies and never once failed United. But United failed him. When he came to his employer with a lawful request grounded in the faith that had sustained him through decades of service, United refused even to hear him out. Instead, the airline clipped his wings and fired him. Twenty-five years, thirty-five years of flying, a career of unblemished service, and Gates received less consideration than United gives a passenger requesting a seat change. The cost of United's cruel indifference cannot be measured in lost wages alone.

**COUNT I**
**Failure to Accommodate Religious Beliefs**
**(Title VII, 42 U.S.C. § 2000e(j) & § 2000e-2(a))**

54.     Plaintiff Christoper Gates realleges and incorporates by reference all preceding paragraphs.

55.     Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e-2(a)(1). Religion "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

56.     Plaintiff holds a bona fide, sincerely held religious belief—rooted in Catholic teaching on the sanctity of human life—that conflicts with receiving a COVID-19 vaccine developed or tested using cell lines derived from aborted fetuses and thus conflicted with Defendant United Airlines' vaccination mandate.

57.     On September 6, 2021, Plaintiff informed Defendant of his religious belief and his conflict with the mandate and thus requested an accommodation.

58.     Defendant refused to engage in any interactive process with Plaintiff about his religious beliefs or to explore a potential reasonable accommodation, such as regular masking and testing or, in the alternative, unpaid leave.

16

59.    Defendant failed to provide Plaintiff with any accommodation. Instead, Defendant terminated Plaintiff for refusing to violate his conscience and comply with the mandate.

60.    Defendant's failure to accommodate violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

61.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff suffered damages, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

62.    Defendant intentionally violated Plaintiff's rights under Title VII with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT II
### Religious Discrimination
### (Title VII, 42 U.S.C. § 2000e-2(a)(1))

63.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

64.    Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e-2(a)(1).

65.    Plaintiff is a member of a protected class. He holds sincerely held religious beliefs as a practicing Catholic that prevented him from receiving a COVID-19 vaccine developed or tested using cell lines derived from aborted fetuses.

17

66.     Plaintiff was qualified for his position. He performed his duties without incident for over twenty-five years.

67.     Plaintiff suffered an adverse employment action when Defendant removed him from the flight schedule on September 28, 2021, and terminated his employment on December 6, 2021.

68.     Plaintiff's termination occurred under circumstances giving rise to an inference of religious discrimination. Defendant's CEO publicly disparaged employees seeking religious accommodations, warning that anyone who "all the sudden decided I'm really religious" would be "putting your job on the line." Defendant designed and enforced an accommodation process intended to discourage and deny religious exemption requests. And Defendant treated Plaintiff less favorably than similarly situated employees who did not seek religious accommodations.

69.     Defendant's stated reason for terminating Plaintiff—that his accommodation request was untimely—was pretextual. Defendant relaxed or ignored deadlines for other employees, including those who received additional time to complete vaccination, those who were on leave when the mandate was announced, and those whose accommodation requests were denied on the merits. Defendant also stipulated to a federal court order enjoining enforcement of the very deadline it invoked against Plaintiff. The deadline was enforced rigidly against employees who, like Plaintiff, sought religious accommodations after August 31, 2021, or who did not receive a vaccination by September 27, 2021.

70.    Defendant further demonstrated discriminatory intent by exempting numerous categories of unvaccinated individuals from its mandate—including passengers, international employees, jumpseat pilots from other carriers, United Express pilots, caterers, and contractors—while terminating Plaintiff, a twenty-five-year employee, for his religious beliefs.

71.    Plaintiff's religious beliefs were a motivating factor in Defendant's decision to terminate his employment.

72.    As a direct and proximate result of Defendant's religious discrimination, Plaintiff has suffered damages, including loss of past and future wages and benefits, emotional distress, humiliation, and other compensatory damages.

73.    Defendant's conduct was intentional, willful, and undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling him to punitive damages.

**COUNT III**
**Retaliation**
**(Title VII, 42 U.S.C. § 2000e-3(a))**

74.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

75.    Plaintiff engaged in activity protected by Title VII when he requested a religious accommodation from Defendant's vaccination requirement.

76.    Defendant was aware of Plaintiff's protected activity.

19

77.    Defendant subjected Plaintiff to adverse employment actions, including removal from the flight schedule on September 22, 2021, and termination on December 6, 2021.

78.    The adverse actions were causally connected to Plaintiff's protected activity. Plaintiff was removed from the schedule sixteen days after requesting an accommodation. He was terminated for "failing to obtain the COVID 19 Vaccination"—a failure that existed only because Defendant refused to accommodate his religious beliefs.

79.    Defendant's own policy prohibited "retaliation, which includes threatening or taking adverse action against an individual, for, among other things, requesting an accommodation." Defendant violated its own policy.

80.    As a direct and proximate cause of Defendant's unlawful retaliatory actions, Plaintiff suffered damages, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

81.    Defendant intentionally violated Plaintiff's rights under Title VII with malice or reckless indifference, and, as a result, is liable for punitive damages.

COUNT IV
**Religious Discrimination Under Colorado Law**
**(Colo. Rev. Stat. § 24-34-402(1)(a)(I))**

82.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

83.    The Colorado Anti-Discrimination Act prohibits an employer from refusing to hire, discharging, or discriminating against any individual with respect

20

to compensation, terms, conditions, or privileges of employment because of the individual's religion. *See* Colo. Rev. Stat. Ann. § 24-34-402(1)(a)(I).

84. Defendant discriminated against Plaintiff because of his religion by refusing to engage in the interactive process, refusing to provide a reasonable accommodation, and terminating his employment.

85. Defendant's stated justification for denying Plaintiff's accommodation request—that it was submitted after August 31, 2021—was pretextual. United extended deadlines in other contexts, provided additional time to employees denied on the merits, and selectively enforced its vaccination requirement against employees seeking religious accommodations while exempting passengers, international staff, jumpseat pilots, Express pilots, caterers, and contractors.

86. As a direct and proximate result of Defendant's religiously discriminatory actions in violation of Colo. Rev. Stat. § 24-34-402(1)(a)(I), Plaintiff suffered damages, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Christopher Gates respectfully requests that this Court:

A. Declare that Defendant violated Title VII of the Civil Rights Act of 1964 and the Colorado Anti-Discrimination Act;

B. Order Defendant to reinstate Plaintiff to a position comparable to his former position with full seniority;

21

C.      Award compensatory damages, including back pay with prejudgment interest, front pay, and the value of lost benefits, in amounts to be determined at trial;

D.      Award damages for emotional distress and mental anguish;

E.      Award punitive damages;

F.      Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and Colo. Rev. Stat. § 24-34-405(4);

G.      Award pre-judgment and post-judgment interest as provided by law; and

H.      Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: December 16, 2025

/s/ Daniel J. Schmid
Mathew D. Staver
(Fla. Bar No. 701092)
Horatio G. Mihet
(Fla. Bar No. 26581)
Daniel J. Schmid
(Va. Bar No. 84415)
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org